## Commonwealth *versus* Central Passenger Railway.

1. The sale of a railroad, &c., under the Act of April 8th 1861, does not extinguish the corporation, but creates the purchasers a body corporate with all the rights, &c., of the corporation whose property they have bought.

2. Irregularities in the organization are not necessarily fatal to the being of the corporation; organization is but the creation of an agency by which it can act; it presupposes its existence.

3. The directions in regard to organization are not conditions of its being; not following them, will at most, *work* a forfeiture and enable the Commonwealth to retake the franchises; it cannot entitle her to judgment that the franchises do not exist.

4. Under an original grant of corporate rights, the grantee must comply strictly with all the conditions precedent to the taking effect of the grant.

5. By the Act of April 8th 1861, all acts subsequent to organization are to be done by the company, and not by the agents for organization.

6. The issue of certificates of stock to the appointees of the purchasers, is an issue to the purchasers themselves.

7. The statutory direction to " determine the amount of the capital stock," does not mean to ascertain the actual cash value put in by the purchasers, but to determine into how many shares of the nominal value of $50 each, the property and franchises should be divided.

8. A proviso in an act prohibited the company from using any railroad, turnpike or *artificial road*, without obtaining the consent of the " parties owning the same." *Held*, that they could not use the paved streets of Philadelphia without the consent of the councils.

9. Graded and paved streets in a city are *artificial roads*.

10. A private corporation claiming franchises against public rights, must show clearly that they are entitled to their claim; if the charter leaves the right doubtful, it will be resolved in favour of the Commonwealth.

11. To give effect to a statute repealing a former statute, the repealed statute must be so pointed to, as to leave no doubt what statute was intended.

THIS was a *quo warranto*, issued October 2d 1865, on the suggestion of William M. Meredith, Esq., the Attorney-General, against The Central Passenger Railway Company of Philadelphia, to show by what warrant they exercised the franchises contained in the information, by which it is alleged that they claimed:—

1. To be of themselves a body politic and corporate, by the name of The Central Passenger Railway Company of the City of Philadelphia.

2. To construct a main line of road or railway entering Broad street, in the city of Philadelphia, at a point north of Tioga street.

3. To construct a railway or road on and along said Broad street, southward of Columbia avenue.

4. To use portions of artificial roads, to wit, graded and paved streets in the city of Philadelphia, for purposes other than the purpose of crossing the same, without first obtaining the consent of the parties owning the same.

5. To construct a railroad or railway with a track or tracks not of the gauge of five feet two inches.

6. To construct a railroad suitable for the passage of heavy freight, burden and passenger cars drawn by locomotive engines, on what are commonly known as railroads, and differently constructed from what are commonly known as passenger railways.

7. To adopt and use steam passenger cars for the purpose of drawing and propelling their cars.

8. To adopt and use steam passenger cars on roads and railways not built and constructed by the said company, or by the North Philadelphia Plank Road Company, or by the North Philadelphia Passenger Railway Company.

9. To adopt and use steam passenger cars on any railway which has been built and constructed since the 16th day of May 1861, by the North Philadelphia Passenger Railway Company or the said defendants, or which the said defendants may hereafter build and construct.

10. To adopt and use steam passenger cars on any road or railway, or any part thereof which the North Philadelphia Passenger Railway Company had not been authorized and empowered to construct on or before the 16th day of May, A. D. 1861.

To the first count the defendants pleaded: That the North Philadelphia Plank Road Company, by virtue of the Act of April 29th 1852, was chartered with certain franchises, which were increased on the 31st of March 1854: one of the new privileges was to mortgage their property, &c.; that, on the 14th of April 1859, their name was changed to The North Philadelphia Passen-

[Commonwealth *v.* Central Passenger Railway.]

ger Railway Company, and by that name they mortgaged their property for $100,000, and it was sold under the mortgage and conveyed to John Loutey on the 14th of January 1863; that an act passed March 14th 1863 extended to this sale the provisions of the Act of April 8th 1861, " concerning the sale of railroads, &c.," and required him to select a president and directors, and the corporation to determine the amount of capital stock; to issue to the purchasers certificates of shares of $50 each, and to issue preferred stock as they might deem necessary, and bonds secured by mortgage; that a corporation, by the name of the Central Passenger Railway Company, with the capital stock of 10,000 shares of $50 each, was duly organized under said acts, &c.

To the second count they pleaded: That the corporation whose privileges, &c., are vested in them, was empowered by the Acts of April 29th 1852 and March 31st 1854 to construct a road from the north line of Penn District, on Seventeenth street, thence (by sundry lines specified) by the intersection of Seventeenth and Tioga streets to Broad street, and down Broad street, &c., all being in Philadelphia; that in pursuance thereof a main line of road was constructed, &c.

To the third count they pleaded: That the corporation whose rights they have, by Act of April 9th 1858, was authorized to construct a railroad from Tioga street to Columbia avenue, and, by the Act of March 14th 1863, the defendants were authorized to continue the road to Green street, which is southward from Columbia avenue, &c.

To the fourth count they pleaded: That, by virtue of the Acts of April 29th 1852, March 31st 1854, April 9th 1858, March 14th 1863, April 12th and 28th 1864, they were empowered to use graded and paved streets in Philadelphia, &c.

To the fifth count they pleaded: That, by virtue of the Act of April 12th 1864, they were entitled to the privileges conferred by the Act of 11th of April 1853 on other railroads, to change the gauge of their road, &c.

To the sixth count they pleaded: That they were authorized, by the Act of 14th of March 1863, in laying their road, to use the best style of rail, and that, by virtue of the said Acts of the 12th day of April 1864 and the 28th day of April 1864, the said company was required to use such form of rail on Broad street, south of Turner's lane, as should be approved by the Board of Survey of said city, &c.

To the seventh count they pleaded: That, by virtue of " An act supplementary to an act to incorporate the North Philadelphia Passenger Railway Company," passed in the year 1861, which was presented to the governor on the 9th of April 1861, and not returned by him within ten days after it had been presented, the corporation, whose franchises these defendants have, was authorized to use steam passenger cars for drawing and propelling their

[Commonwealth *v.* Central Passenger Railway.]

cars on any road which they then had built, and on any road which they might thereafter build, which privilege was by the said act so limited as that cars propelled by steam should not be run upon said road south of Columbia avenue ; that afterwards, by an Act of the 14th of March 1863, hereinbefore pleaded, the said proviso prohibiting the right to run cars propelled by steam south of Columbia avenue was repealed, &c.

To the eighth count they pleaded that by virtue of sundry Acts of Assembly specified, they and the corporation whose rights they have, were authorized to connect their railway with other railways, and run their cars on them, &c.

To the ninth count they pleaded that by the aforesaid act, presented to the governor on the 9th of April 1861, and not returned within ten days, the North Philadelphia Passenger Railway Company was authorized to use steam passenger cars on any road which they had built, and on any road which they might thereafter build ; but so that cars propelled by steam should not be run upon the said road south of Columbia avenue. And after the franchises of the last-mentioned corporation had vested in these defendants, by virtue of the said Act of Assembly, approved the 14th of March 1863, they were relieved from the said restriction upon using steam passenger cars, and upon their use south of Columbia avenue, &c.

To the tenth count they pleaded that by virtue of the aforesaid act, presented to the governor April 9th 1861 and not signed, &c., the North Philadelphia Passenger Railway Company was authorized to use steam passenger cars on their roads, with the restriction not to run them south of Columbia avenue ; and the rights of that company being vested in them by virtue of the Acts of March 14th 1863 and April 12th 1864, the restriction was removed, and by the same act they were authorized to extend to their road as set out, and have the same privileges on their extended road as they had on other portions of the road, and have all the privileges given by the general Railroad Law of February 19th 1849, &c.

The Attorney-General demurred to all the pleas.

The grounds of defence and demurrer are particularly stated in Justice Strong's opinion.

*R. C. McMurtrie, G. W. Biddle* and *W. B. Reed,* for respondents.—The writ being brought against the defendant by its corporate name instead of the individuals claiming to be the corporation, the Commonwealth is estopped from denying its existence : Com. Dig., *Quo Warranto,* C 2 ; Id. C 3 ; Reg. *v.* Cusack, 2 Roll. 115 ; Smith's Case, 4 Md. 58 ; Rex *v.* Amery, 2 T. R. 521–2 ; 2 Brown's P. C. 326 ; State *v.* Bank, 6 Sm. & Marsh. 599–614.

It is not disputed that there was a corporation ; that the legislature authorized the pledging of the franchises, and that there was a lawful sale of them. The purchasers, therefore, became *ipso facto*

[Commonwealth *v.* Central Passenger Railway.]

a corporation. A grant *de novo* of franchises would be different. There the consideration is the exact compliance with the terms.

The averment in the plea that Loutey was constituted a body politic, if wrong, was superfluous, and cannot be taken advantage of on demurrer: Steph. Pl. 424. The objection that the persons for whose account he purchased were incorporated, is not maintained, for the Acts of April 1861 and March 1863 make him a corporation by conferring on him corporate franchises. And if the *effect* of the acts is misstated it may be amended: Commonwealth *v.* Gill, 3 Wh. 228; King *v.* Birch, 4 T. R. 608. Loutey was to bring the corporation into existence; the other acts were to be done after its creation. But if he was only an *agent* of the state, and failed to do what he was required, his error can be corrected: Patterson *v.* Arnold, 9 Wright 414; State *v.* Bank, *supra*. Omitting in the pleas those who joined in the purchase can be taken advantage of only on special demurrer, and may be amended: Palmer 81. It is the same as to the omission to state the amount of stock. The power, such as here, to fix the amount of stock is in the discretion of the parties, who would consider as well the value of the *franchises* as the mere *property*.

The Commonwealth has despotic power over the streets: she and not the city has the ownership: Case of Philadelphia and Trenton Railroad Co., 6 Wh. 25; Act of March 14th 1863. "Artificial" road in Pennsylvania means a road for the profit of the adventurers: 3 Sm. L. 82, 191, 453. "Railroad" and "Railway," in general legislation, mean the same, and the privilege to alter the gauge being conferred on "*other railroad* companies," it is extended to this. The company, having the right to use steam-power, has the discretion to use rails suitable for that, although it may be different from horse-car roads.

As to the power to use steam, where an act excepts another act from a repealing clause, the recital of the latter act by a wrong date will not repeal it, if the exception be intended to apply to such act: Pilgrim *v.* The Railway, 7 C. B. 210, 223, 226; Reg. *v.* Wilcock, 7 Q. B. 317, 329, 338; Reg. *v.* Biers, 1 A. & E. 327.

*Meredith*, Attorney-General, for the Commonwealth.

The Reporter had no paper-book for defendant in error.

The opinion of the court was delivered, June 25th 1866, by

Strong, J.—It is of no importance to the present case that we should inquire whether the information, filed as it has been against the Central Passenger Railway Company by its corporate name, admits of record that it is a corporation *de jure*, for we are all of opinion that the plea sets forth sufficiently its corporate existence.

It is made to appear beyond doubt, that prior to the 28th day of July 1859, there was a corporation, created under the law,

and authorized to construct and use an artificial road, at first a plank-road, and afterwards a passenger railway. On the 28th day of July 1859, this corporation duly mortgaged its road, property and franchises to John Welsh and William L. Schaffer, to secure bonds issued by it, amounting to $100,000. The mortgagees were trustees for the bond-holders, with a power of sale. In pursuance of the power there was a sale, under the mortgage, of the road, property and corporate rights and franchises of the mortgagors to John Loutey, on the 14th day of January 1863. Though not a judicial sale, its effect was, by the Act of March 14th 1863, declared to be the same as by the Act of April 8th 1861 it had been enacted should be the effect of a sale of any railroad, canal, bridge or plank-road of any corporation, sold and conveyed under and by virtue of any process or decree of any court in this state. That act declares, that the person or persons for or on whose account such railroad, canal, turnpike, bridge or plank-road may have been purchased shall be, and they are by the act constituted a body politic and corporate, invested with the right, title and interest of the former corporation in the property purchased, and also with the corporate franchises existing at the time of the sale. The act also makes provision for the organization of the new corporation. The Act of March 14th 1863 was an attempt to apply the provisions of the Act of 1861 to the sale made by the trustees to John Loutey. It directed him to do, respecting an organization of a new company, what under the first act it was made the duty of purchasers at a judicial sale to do, with a single exception. It required him to organize the new corporation, under the name of The Central Passenger Railway Company of the city of Philadelphia, to select a president and a board of directors, and to do and perform all and singular the matters and things in the said act specified, with like effect as though the sale and conveyance had been made to two or more persons.

The plea avers the sale to John Loutey, the Enabling Act of 1863, the facts that he did organize the new corporation with the name prescribed by the Act of Assembly, did select a president and a board of directors, and that the corporation thus organized did adopt a corporate seal, determine the amount of the capital stock, and issue certificates therefor to the persons who had united in the purchase with him, the said John Loutey, and for whose account he had purchased to the amount of their respective interests therein, or to such persons as they requested. The plea also avers, that a certificate of the organization was made by the corporation, under its common seal, attested by its president, and transmitted to the secretary of state, to be filed in his office, there to remain of record. This certificate was filed on the 7th day of March, A. D. 1863. It sets forth the date of the organiza-

tion, the corporate name, the amount of capital stock, and the names of the president and directors.

To this plea the Commonwealth has demurred, and several reasons have been assigned why it should be held insufficient. It is to be observed of them all, with perhaps one exception, that they relate to alleged errors in the organization of the new company. They do not touch its corporate existence. And yet the existence of the company, and not its regular organization, is what is called into question by the information. It is obvious that irregularities in the organization of a corporation are not necessarily fatal to its being. Organization is but the creation of an agency by which the corporate body can act. It presupposes the existence of the artificial person. The Act of April 8th 1861, supplemented by the Act of March 14th 1863, created the new corporation. It declares in express terms that the purchasers, or the person or persons for or on whose account a railroad of a corporation, or a canal, turnpike, bridge or plank-road may be purchased, shall be and they are by that act itself constituted a body politic or corporate. Provision is then made for subsequent organization, for adopting a corporate name, a common seal, &c. This case is not, therefore, to be confounded with the case of an original grant of corporate rights, when the grantee must take on the terms on which the franchise is offered. Such a grantee must comply strictly with all the conditions precedent to the taking effect of the grant, and there are usually precedent conditions. But in this case the corporate franchise was in existence when the sale was made to John Loutey. As declared by the Act of 1861, the sale did not work its extinguishment, and the Commonwealth did not seize it. On the contrary, that act declares that the franchises shall vest in the purchaser or purchasers, and that he or they shall be a body corporate, and seised of all the rights, powers, privileges and franchises of the corporation of whose property they become the purchasers. The directions in regard to subsequent reorganization, therefore, are not conditions of being, as possibly they might be if the purchasers did not take by succession. The utmost effect of not following those directions strictly can be no more than to *work* a forfeiture, and enable the Commonwealth to retake the franchise. It cannot entitle her to a judgment that the franchise has no existence.

The first objection to the plea is that it alleges John Loutey, the purchaser, became, in virtue of the Acts of Assembly set forth, himself a body politic or corporate. For this averment it is contended there is no warrant in the law. When it is considered that the question raised by the information and plea with the demurrer is, whether *the defendants* have shown that they are of themselves a body politic and corporate, by the name of The Central Passenger Railway Company of the city of Philadelphia,

[Commonwealth *v.* Central Passenger Railway.]

it is manifest that both the averment objected to and the objection are of no importance. Whether Loutey became a corporation or not by his purchase does not affect the inquiry whether the defendants have corporate rights. At the worst, this averment of the plea is surplusage. If it be conceded that he did not become a body corporate, but only an agent designated by the law to organize a new corporation, it still remains to be seen whether the plea does not sufficiently aver the existence of the defendants by the name prescribed by the Act of Assembly, and whether, therefore, the demand of the writ is not in this particular fully answered. It is averred that he did organize the company with the name given to it by the Act of 1863, and did select a president and directors. It is also set forth that the corporation so authorized did adopt a common seal, determine the amount of the capital stock and issue certificates to the persons who had united with him in the purchase of the road, and for whose account he had purchased, or to such persons as they requested. If this was what the Acts of Assembly required, the averment that John Loutey became a corporation was merely superfluous and impertinent.

A second objection to the sufficiency of the plea is that it sets forth that the corporation adopted a common seal and determined the amount of its stock, when, by the Act of Assembly, it was made John Loutey's duty to do those acts. We do not see how this shows that the corporation was never in being, or that it is a ground of forfeiture. And it is by no means certain that these duties were by the law imposed upon Loutey. By the act, his only duties, as specified, were to organize the corporation and select its officers. Besides these, he was required to " do and perform all and singular the matters and things in the said act (the Act of April 8th 1861) specified, with like effect as though the sale and conveyance had been made to two or more persons." The Act of 1861 authorized the person or persons for or on whose account a railroad, &c., had been or might be purchased at a judicial sale to meet and organize the new corporation, and select temporarily a president and board of directors. It also required them to adopt a corporate name and seal, and determine the amount of capital stock thereof; and it empowered, but did not require them, to issue certificates for the stock to the purchaser or purchasers to the amount of their respective interests. It also empowered them to issue preferred stock, either then or at any time thereafter, and also to issue bonds and to mortgage the corporate property and franchise.

It did not direct whether all these acts should be done by them as individuals or as a corporation, of which they are at first exclusively the corporators. In either event, the determination of the amount of the stock and the adoption of the corporate seal are

2 P. F. SMITH—33

their acts. What purchasers under a judicial sale were required to do became the duty of John Loutey. But a reasonable reading of the Act of 1861 leads to the conviction that all acts subsequent to the organization of the new company and the selection of its officers are intended to be done by those who are the equitable owners of the property purchased, that is, by the company itself, and not by mere agents for organization. The adoption of a common seal, and fixing the amount of the stock, are acts of corporate management in their nature. If, then, it was intended to place the organization of the parties in interest in the purchase of the road of the North Philadelphia Railway Company on the same footing with the organization of other companies under the Act of 1861, it cannot be held that adopting the corporate seal and determining the amount of the stock by Loutey were essential to the existence of the new company under its corporate name.

A third objection is that the plea avers certificates of stock were issued, not exclusively to the persons for whose account the road had been purchased, but to them, or to such persons as they requested. For this it is said there is no authority of law. Yet, if this was all wrong, it does not militate against the existence of the corporate body. We think, however, it was a compliance with the Act of Assembly, and that it would be a narrow construction to hold otherwise. Issue of the certificates to the appointees of the purchasers was a substantial issue to the purchasers themselves.

And we see nothing substantial in the fourth objection to the plea, which is that it is defective in not setting forth the names of the persons for or on whose account the railway and franchises were purchased, and in not stating the amount at which the capital stock was determined, and the amount of the respective interests of the parties. These particulars have no bearing upon the question the defendants are by the writ required to answer, and they are not essential to anything involved in this case. And if they were, the defendants would be allowed to amend by pleading with greater particularity.

The objection most pressed against the plea of the defendants is that the amount of the capital stock was unlawfully determined at $500,000, as it appears by the certificate filed of record in the office of the secretary of state, which certificate is pleaded. It is insisted that the statutory direction to " determine the amount of the capital stock" means to " ascertain the actual cash value put in by the purchasers of the property and franchises which form the capital stock," and this it is said was in the present case either the purchase-money paid by John Loutey ($21,000), or $100,000, the amount of the mortgage under which the property was sold. Such we think, however, is not the meaning of the act. Had such been the intention of the legislature, it is probable they would have said the capital stock of the new company

[Commonwealth v. Central Passenger Railway.]

should be equal in amount to the aggregate of the investments of the purchasers. It must have been considered that the purchase-money paid at the sale of such property is no fair test of its actual value, and that to enable the new company to meet the purposes of its existence, greater investments would be needed than the purchase-money of the old improvement. Hence authority was given to create preferred stock to such an amount, and on such terms as might be deemed necessary. This manifests that there was no intention to fix a legislative limit to the amount of stock. The language of the Act of Assembly is, not that the persons intrusted with the power of determining shall "ascertain" and declare the amount. Their duty is not to make inquiry and report, but to do what the legislature often does itself, determine into how many shares, each of the nominal value of $50, the representative of the property and franchises of the corporation is to be divided, and to allot to each purchaser his respective or proportional number of shares. Such, we think, is the common understanding of the phrase "determine the amount of capital stock," and such is its meaning in other Acts of Assembly, in most, if not all cases where corporate rights are given to the owners of land, either for its improvement or management. Thus the act in regard to mining companies, while it declares that the land to be held by the company shall form a common stock, and be divided into shares of $50 each, and apportioned among the owners and subscribers to said stock, according to their respective interests, authorizes the companies to determine the number of shares into which the land has been divided. It leaves them free to fix the amount of their capital stock at their pleasure. It does not confine the amount to a sum equal to the cost or actual value of the land. This is the usual course of legislation when the property of a corporation is not made up of money exclusively, but is land, or rights of indeterminate and fluctuating value, or when several joint owners of a property are authorized to hold and manage it as a corporation. In all such cases the determination of the amount of stock must be an arbitrary adjustment. As we have said, the cost of the property is no fair measure of what the stock represents, and if the real value be adopted as the standard, it is no standard at all. It varies with the estimates of witnesses, and the franchises are incapable of valuation. We hold, therefore, that determining the amount of the stock to be $500,000 was an act authorized by the legislature. If that was a sum greater than the actual value of the company's franchises and property, as it was greater than the cost, we are unable to see how the public was affected by the exaggerated estimate. It follows that the demurrer to the 1st plea cannot be sustained, and judgment will be given for the defendants that they are a body politic and corporate by the

name of The Central Passenger Railway Company of the City of
Philadelphia.

Following the course of the argument, we pass now to consider
the defendants' plea to the 4th count of the information, and we
are of opinion that the plea shows no sufficient authority " to use
portions of artificial roads, to wit, graded and paved streets in the
city of Philadelphia, for purposes other than crossing the same,
without first obtaining the consent of the parties owning the
same." The Act of March 14th 1863, one of the acts which the
plea vouches as conferring such a franchise, contains the following
proviso : " Provided also, that said Central Passenger Railway
Company of the City of Philadelphia shall not have the right to
use any portion of any railroad, turnpike or artificial road, except
for the purpose of crossing the same, without first obtaining the
consent of the company or parties owning the same." The same
prohibition is found in the subsequent Act of April 12th 1864.
None of the other Acts of Assembly incorporated into the plea
relieve the defendant from this prohibition. That graded and
paved streets of the city are artificial roads admits of no question.
These are as much so as are turnpikes, which are but graded
roads covered with gravel or stone. In a loose sense, most roads
are artificial roads, but there are in our legislation many instances in
which a distinction seems to have been made between the common
country road and the streets of a city, and the fact that artificial
roads are coupled with railroads and turnpikes, evidences that the
legislature had in view something *ejusdem generis;* something
of the same nature as turnpikes. It is manifest that the phrase
artificial roads was used to express more than was expressed by
the words railroads and turnpikes. It is of larger significance.
They are mentioned, and in addition to them a more comprehen-
sive description of roads, to wit, artificial roads. What are these
if not streets of the city graded and paved ? Nothing else than
such streets seems to meet the added description, unless it be
plank-roads, and if such alone were intended, it would have been
natural to have named them with railroads and turnpikes, rather
than to have used a more comprehensive term. We are not
informed whether there were any plank-roads, not belonging to
the defendants, between the termini of their proposed railway at
the time when the acts were passed. If there were not, it is
quite unlikely that the legislature had such roads in view exclu-
sively when they prohibited the use of artificial except upon con-
ditions. In looking for the intention of the legislature we cannot
be unmindful of the fact that the defendants are a private corpo-
ration, claiming franchises against public rights. They must show
clearly that they are entitled to what they claim. If their charter
leaves their right doubtful, the doubt must be resolved in favour
of the Commonwealth. And such is the magnitude of the fran-

[Commonwealth *v.* Central Passenger Railway.]

chise here claimed, so seriously does it affect the rights and convenience of a large community, that there is a double reason for requiring a grant in language that has no ambiguity. If the power of the legislature be conceded to devote the graded and paved streets of the city to private uses, without the consent of those who are most interested, represented by the city councils, it is still the duty of courts to presume they have not exercised this power, until the contrary is shown in unmistakeable language.

Nor can we lose sight of the fact that in very many cases, nearly all, indeed, in which charters have been granted for passenger railways in the city, the grantees have been required to obtain the consent of the city councils prior to their taking possession of the streets along the line of their authorized routes. We should naturally expect to find such a requirement in the charter of the defendants, and when we find a clause that may bear such a construction, the legislative policy exhibited by the usage in other cases is a reasonable guide to the meaning of that clause. The Act of April 9th 1858, under which the defendants claim their rights in part, it being the act which first empowered The North Philadelphia Plank Road Company to build a passenger railway, by its 3d section required obtaining the consent of the city councils to the occupation of the streets. It required also conformity to the grades of the streets and to the city ordinances. This section was repealed, it is true, with many others in that act, and in other acts, by a sweeping clause contained in the Act of 1863. But the proviso in the Act of 1863, as well as the provision in the Act of 1864, appear to have been intended to supply the place of so much of the 3d section of the Act of 1858, as required the consent of the city councils to occupation of the streets.

It is said, however, the city councils are not owners of the streets, and that only such artificial roads are intended as have owners. It is true the councils are only in a subordinate sense owners of the streets of the city. Yet the city does own the paving-stones which make the streets. The councils are the legal custodian having power to alter grades and to change the kind of pavements at pleasure, and it is their duty to hold the streets for the public in good order at all times. It is, therefore, no stretch of language to speak of the city as a party owning the streets. As already remarked, it has often been recognised by the legislature as having a right in the streets so far as to make the consent of councils a prerequisite to their appropriation to the uses of individuals and private corporations. This is conceding to the city the rights of ownership. Besides, in common understanding, the streets belong to the city. They are thus spoken of. This may not be technically correct, but the words used by the legislature have no technical meaning. Another

[Commonwealth *v.* Central Passenger Railway.]

general observation ought to be made applicable not only to the clause more immediately under consideration, but to the entire legislation respecting the defendants. The Acts of Assembly under which they claim, and which it ought to be presumed were drafted by them, are almost unprecedentedly obscure. They are inexcusably so. It is difficult to avoid the suspicion that they were thus drafted for a purpose. Some of the most important privileges claimed under them, those in which the public are most deeply interested, if granted at all, are given in the most circuitous and indirect manner, in language not usual when similar privileges have been granted by the legislature. The defendants have, therefore, no cause to complain if every intendment not entirely unfounded be made against them. For these reasons, looking to the language of the Acts of Assembly, to the previous legislation, and to the well-known policy of the state respecting the use of the streets of the city by railway companies, there is room for grave doubt whether by "artificial roads" the legislature did not mean the graded and paved streets of the city. And if there are such doubts, they are decisive against the defendants. We hold, therefore, that the defendants have shown no right "to use portions of artificial roads, to wit, graded and paved streets in the city of Philadelphia, for purposes other than the purpose of crossing the same, without first obtaining the consent of the parties owning the same." The city of Philadelphia we hold to be such a party within the meaning of the Act of Assembly. Judgment will, therefore, be given for the Commonwealth on the demurrer to the defendants' 4th plea.

The next question is whether the defendants have shown a right to construct a railway or railways of any other gauge than five feet two inches. We think they have. It is enough for this that the Act of April 12th 1864 enacts that they shall have, exercise and enjoy all and every the rights, powers, liberties, privileges, franchises and immunities mentioned in the general act regulating railroad companies, approved the 19th day of April, A. D. 1849, and conferred upon other railroad companies by said general act by an act approved the 11th of February 1853, and any other general act relating to railroad companies then in force in this Commonwealth. The Act of 1853, referred to, authorized every railroad company then chartered, or that might thereafter be chartered, to construct or change their gauge or gauges of road to such a width as the directors of such railroad company may deem expedient. Thus this power to use any gauge was conferred upon the defendants. We do not see that it is at all material that they are a railway company.

The demurrer to the 6th plea is sustained. Beyond doubt the defendants were incorporated as a passenger railway company, and nothing more. Nothing in any Act of Assembly indicates an

intention to confer upon them general railroad privileges, and a distinction has been recognised between railroads as a class and passenger railways. The first section of the Act of April 9th 1858, the act which first authorized The North Philadelphia Plank Road Company to construct a railroad, enacted that it should be used exclusively with horse power and for passenger travel (a precise description of what is understood in our legislation to be the use of a passenger railway as distinguished from a railroad). It gave to that company " power to carry passengers" over their improvements, and to purchase equipments for " said railways," and it enacted that " no freight or burden trains or locomotives shall be permitted to pass over the same." In 1859 the name of this company was changed to The North Philadelphia Passenger Railway Company. The Act of March 14th 1863, in its 2d section, enacts that The Central Passenger Railway Company shall in all respects, not by acts under which it is organized or thereby modified, be subject to the provisions of the 1st section of the Act of April 9th 1858. But nowhere has the prohibition against freight or burden trains been taken off. Throughout all the acts from 1858 down to the last the defendants are treated as a railway company for the accommodation of passenger travel alone. If the prohibition against using locomotives has been removed, it was by the act presented to the governor on the 9th of April 1861, and that only authorized the use of " steam passenger cars." (Whether the defendants are entitled to the privileges of that act we shall see hereafter.) Conceding for the present that they are, it does not give permission to run freight or burden trains, or to transport anything but passengers. It does not change the purposes of their creation and convert them into a railroad company.

At most the steam passenger cars which they may use must be such as can be used upon what are commonly understood to be passenger railways. There is still no authority to construct a railroad. The defendants can have no greater rights than such as enable them to carry out the purposes of their creation, which were to make and use a passenger railway, unless such greater rights have been expressly granted. It follows that with powers to build passenger railways only, they must use a rail appropriate to such structures. It is notorious that a rail suitable for the transport of freight, or for the purpose of burden trains, is a much greater public inconvenience in a street than is a rail usually employed for passenger transportation on street railways. A power to subject the public to a slight inconvenience cannot be used to cause a greater.

We find nothing in any of the Acts of Assembly referred to in this plea, which gives to the defendant a right to construct a railroad suitable for burden and freight trains drawn by locomotives,

[Commonwealth *v.* Central Passenger Railway.]

or to lay down rails suited for such a structure, or to lay down any rail except such as is suited to what are commonly known as passenger railways.

The only remaining question that needs consideration is, whether the defendants have a right to adopt and use steam passenger cars for the purpose of drawing and propelling their cars. No other warrant for their claim to such a right is averred than an Act of Assembly, never approved by the governor, but presented to him on the 9th of April 1861, and not returned within ten days (Sundays excepted) after it had been presented to him. It was certified by the clerks of the House of Representatives and of the Senate on the 16th day of May 1861. Its title was, " An Act supplementary to an act to incorporate the North Philadelphia Passenger Railway Company." The 1st section authorized the said company to adopt and use for the purpose of drawing and propelling their cars, steam passenger cars, with a proviso that no cars propelled by steam should be permitted to run south of Columbia avenue.

The defendants claim that they are entitled to the privilege given by this section to the North Philadelphia Passenger Railway Company, and that the proviso has been stricken out. By the 2d section of the Act of March 14th 1863, the Central Passenger Railway Company was made subject to the provisions of certain public Acts of Assembly, and to parts of certain private acts relating to the North Philadelphia Plank Road Company, and all other acts or parts of acts relating to said company were repealed. Among the parts of acts referred to as those to which the defendants were " made subject," is one described as follows : " The 1st section, except the proviso thereto, of a further supplement, passed the 9th day of April, Anno Domini one thousand eight hundred and sixty-one."

The doubt is to what this description applies. Does it unmistakeably apply to the Act of 1861, which gave power to the North Philadelphia Plank Road Company, or the North Philadelphia Passenger Railway Company, to use steam passenger cars ? Does it save that act from the effect of the clause which repealed all acts and parts of acts relating to that company that were not expressly continued ? This is a question of legislative intention, not of pleading. The legislature calls the act intended to be saved from repeal " a further supplement" (that is, a further supplement to the act incorporating the North Philadelphia Plank Road Company).

Such, however, is not the title of the act relating to steam passenger cars, nor is it any part of the title. Its real title is, " An Act supplementary to an Act to incorporate the North Philadelphia Passenger Railway Company."

Again, the legislature describes the act saved from repeal, as

[Commonwealth *v.* Central Passenger Railway.]

passed on the 9th day of April 1861. But the act authorizing the use of steam passenger cars was not passed on that day, in any sense known to the law or to common understanding. It was presented to the governor on that day, but it did not then become a law. There is nothing to show that it ever received the sanction of both houses of the legislature, or even of one of them, on that day. It may have passed the Senate and House before, and been delayed for engrossment and signature by the speakers'. Nor is the act saved to be known by a description of its subject-matter. There is no reference to that, unless it be that it is called A further supplement to another act, and we may infer that it had a proviso.

It is identified then by none of the usual *indicia,* neither by date nor title nor subject-matter. We may conjecture that the act certified May 16th 1861 was intended ; but in a matter which involves the grant of a franchise to a private corporation, conjecture is not sufficient. The defendants must show a clear and indubitable right to every franchise which they claim. In some cases, it is true, courts will hold that a misrecital of an Act of Assembly in another act may be cured. Effect will be given to a statute repealing a former statute, though the former be incorrectly described. But still there must be something which points to it, and leaves no doubt what statute was intended. In Regina *v.* Wilcock, 7 A. & E. N. S. 317, where the question was, whether a statute, 17 Geo. 3, ch. 56, had been repealed, the court held that it had, though the repealing act described it as passed in the 13th year of George the 3d. There was a mistake of the date, but the act held to be repealed was also described by a recitation of its title, and that title was the title of the Act of 17 Geo. 3d. The title was correctly recited. Here the date does not point to the act alleged to have been preserved from repeal, and its title is not given.

It is remarkable that the language used in the 2d section of the Act of March 14th 1863 is sadly inappropriate, if the intention was to incorporate into the defendants' charter the act giving a right to use steam passenger cars. The section declares that the defendants shall " be subject" to the provisions of certain acts, and subject to parts of other acts, among which is enumerated " the 1st section, except the proviso thereto, of a further supplement, passed the 9th day of April 1861." If this points to the act certified May 16th 1861, privileges are granted instead of burdens imposed. Striking out the proviso of the 1st section of that act, nothing remains but the gift of a right—nothing to which the defendants can be servient. Can it be that the legislature intended to confer a right by words that import subjection to burdens ? Did they intend by such words to enlarge power, and especially to grant a right so affecting the public as does the right

[Commonwealth *v.* Central Passenger Railway.]

to use steam ears on the streets of a large city ? They knew what are fit words for the grant of privileges by reference to former acts. Fit words were used in the Act of April 12th 1864, an act relating to the same railway company.

Too much, however, must not be made of this. Some of the other acts, clearly described, to which the defendants are declared subject, confer rights as well as define restrictions, and these rights must be held to have been granted. Yet grant of power by such language is unusual; and it is dangerous. It enables adventurers to secure rights which the legislature may never have intended to give, and which would have been refused had the grant asked been clothed in appropriate language. Those, therefore, who claim under such grants, have no cause to complain if they are held to the strictest certainty in every particular.

With such reasons for doubt as to the intention of the legislature, we are not prepared to hold that the Act of 1863 excepted out of its repealing clause the Act giving to the North Philadelphia Passenger Railway Company the right to use steam passenger cars. The defendants have not shown, with that certainty to which they ought to be held when they claim corporate rights against the Commonwealth, that the portion of the Act of 1861 upon which they rely is in force.

The demurrer to the 2d and 3d pleas were not pressed in the argument, and our opinion of them will be sufficiently expressed by our judgment.

> Judgment for the defendant on the demurrer to the pleas to the 1st, 2d, 3d and 5th counts of the information; and judgment for the Commonwealth on the demurrer to the pleas to the 4th, 6th, 7th, 8th, 9th and 10th counts; and judgment of ouster accordingly.